UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TERI MAZONSON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 15-cv-12979-ADB |
| CAROLYN COLVIN, | * | |
| *Commissioner of Social Security*, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Teri Mazonson ("Ms. Mazonson" or "Claimant") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") benefits. Currently pending is Ms. Mazonson's motion to reverse the Commissioner's decision denying her disability benefits [ECF No. 15]. For the reasons described herein, the Court finds that, although the ALJ failed to comply with the requirement of SSR 83-20 to have a medical advisor testify regarding the date of onset, the error in this case was harmless. Therefore, the Court **DENIES** Ms. Mazonson's motion to reverse and remand.

I.  **BACKGROUND**

   A.  **Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims**

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### B.      Procedural Background

Ms. Mazonson filed her application for SSDI benefits on June 21, 2012. [R. 111].[1] She alleged that she became disabled on December 1, 2007, due to multiple sclerosis and depression. [R. 124]. Her date last insured was December 31, 2007. [R. 121].

The Social Security Administration (the "SSA") denied Ms. Mazonson's application for SSDI benefits on August 14, 2012, and again upon reconsideration on November 1, 2012. [R. 54, 65]. Thereafter, Ms. Mazonson requested an administrative hearing [R. 74], and a hearing took place before Administrative Law Judge ("ALJ") Stephen C. Fulton on October 29, 2013. [R. 21]. Ms. Mazonson, who was represented by counsel, appeared and testified at the hearing. [R. 21–22]. On December 26, 2013, the ALJ issued a decision finding that Ms. Mazonson was not disabled. [R. 7]. The SSA Appeals Council denied Ms. Mazonson's Request for Review on May 14, 2015 [R. 1]. On July 19, 2015, Ms. Mazonson filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

### C.      Factual Background

Ms. Mazonson was born on July 22, 1972. [R. 111]. She has been married to Adam Mazonson since 1999, and they have two children. [R. 112]. Ms. Mazonson currently lives in Canton, Massachusetts. [ECF No. 1]. She has a college degree and a law degree. [R. 23–25].

Ms. Mazonson worked as a lawyer from approximately 1998–2000, and then as a consulting real estate lawyer in approximately 2003. [R. 132]. She briefly operated a day care

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 9, are cited as "[R. __ ]."

3

business in approximately 2005. [R. 36, 132]. She also worked for the Town of Canton as a substitute teacher and a children's librarian in 2010 and 2011. [R. 28, 132].

### D.   Medical Evidence

#### 1.   Prior to the Expiration of Claimant's Insured Status

The medical evidence submitted by Ms. Mazonson begins in August 1996, when she sought treatment after tripping over a blanket while walking down the stairs. [R. 222]. Ms. Mazonson presented at New England Baptist Medical Center with pain and severe swelling in her right ankle. Id. After imaging studies ruled out the possibility of dislocation or fracture, Ms. Mazonson was discharged to outpatient care. Id. On November 28, 1999, Ms. Mazonson was admitted to the same hospital with complaints of a severe headache. [R. 205–206]. She was provided with stabilizing medical treatment and advised to return for imaging studies if the headache persisted. [R. 211].

On January 16, 2003, at a routine physical examination performed by David Faling, M.D., Ms. Mazonson reported that she was "in good health." [R. 368]. Over the previous seven days, she had experienced nasal congestion, clear nasal drip, and a dry cough. Id. Dr. Faling recorded a "normal physical examination" and advised Ms. Mazonson to pursue health care maintenance including breast exams, colorectal cancer screening, and heart health including exercise and "cholesterol goals." [R. 369].

On March 12, 2003, Joan Spiegel, M.D., evaluated a mild rash on Ms. Mazonson's forearm. [R. 366–67]. Ms. Mazonson was diagnosed with eczematous dermatitis of the arm, atypical nervus of the umbilicus, and benign nevi over the trunk. Id. She was given prescription medication and was advised to follow up in the next few months to have lesions removed. Id. On April 18, 2003, Ms. Mazonson returned for a follow-up appointment with Dr. Spiegel. [R. 365].

She had the lesions removed, and was advised to return for suture removal in ten to twelve days. Id. On April 30, 2003, Ms. Mazonson returned to Dr. Speigel's office to have her sutures removed. [R. 364.] Dr. Speigel observed that the area had healed well, and advised Ms. Mazonson to follow up in six months for a repeat skin check. Id.

On July 15, 2003, Ms. Mazonson underwent an imaging study of her brain, apparently related to "suspected new onset of seizure," although the record contains little information about what led up to that test. [R. 378]. The study indicated a likely congenitally small left transverse sinus with reconstitution of the left sigmoid sinus, as well as retention cysts in the left maxillary and right sphenoid sinuses. Id. There was no evidence of acute ischemia and the MRA was unremarkable. Id.

On September 26, 2007, Ms. Mazonson visited Dr. Stephen Tarpy, a primary care physician at the Granite Medical Group, to "get acquainted." [R. 224–25]. She talked about "no pain lately" from a car accident where she suffered neck and back pain after being rear ended. [R. 224]. She said that she exercised three times a week and that she was not on any medications, except for a multivitamin and a fish oil supplement. [R. 224–25]. At the conclusion of her examination, Ms. Mazonson was advised to follow up in a year for another physical examination. Id.

Ms. Mazonson returned to her primary care office on October 9, 2007, complaining of an intermittent sore throat, earache, cough, and runny nose over the previous three days. [R. 226]. She was diagnosed with acute pharyngitis, and was advised to get a bacteriology strep test. [R. 227]. This is the last record before Ms. Mazonson's insured status expired on December 31, 2007.

### 2. Record Evidence After the Expiration of Claimant's Insured Status

Ms. Mazonson had an appointment with Huma Masood, M.D., a primary care physician affiliated with Beth Israel Deaconess Medical Center, on April 16, 2009, to check an enlarged lymph node in her neck following a sore throat. [R. 382]. She reported fatigue and achy knees, and was concerned about rheumatoid arthritis. Id. She had been diagnosed with an affective disorder in the past, and also suspected posttraumatic stress disorder stemming from an incident where her sister was strangled and raped, but she indicated that she felt fine at that time. [R. 383]. Her social history reflected that she was a stay-at-home mother and was not working in order to be with her children. Id. Dr. Masood observed that Ms. Mazonson's enlarged lymph node appeared benign. [R. 384]. Dr. Masood also noted that Ms. Mazonson reported improvement in knee achiness after resuming exercise, and the doctor noted no joint stiffness or abnormality upon examination. Id.

Ms. Mazonson saw Danru Lee, M.D., Ph.D., also a primary care physician affiliated with Beth Israel Deaconess Medical Center, on April 29, 2009, about joint aches, fatigue, excessive sleep, and crying. [R. 386]. She reported worries about an autoimmune disease or Lyme disease. Id. Dr. Lee noted that she had enlarged lymph nodes, which appeared benign. [R. 387]. He agreed to test Ms. Mazonson for Lyme disease. Id. After noting no objective findings other than joint pain, Dr. Lee discussed supportive care. Id.

Ms. Mazonson returned to Dr. Masood on June 17, 2009, with continued concern about her lymph nodes. [R. 388]. Dr. Masood diagnosed her with lymphadenopathy, explained that it is a benign condition, and noted a normal lymphocyte count when it was checked in April 2009. Id.

On June 2, 2011, an MRI scan of Ms. Mazonson's brain revealed extensive T2 signal abnormalities, some of which were enhanced, with an appearance consistent with a

demyelinating disorder, such as multiple sclerosis (MS). [R. 264–65]. An MRI of the cervical and thoracic spine obtained the next day revealed abnormal signal focus at the T5–6 level of the thoracic cord, suspicious for demyelinating disease, in view of the florid abnormalities previously observed in the brain. [R. 266–67]. A few days later, Ms. Mazonson had an appointment with Margot Geffroy, M.D., a neurologist, who opined that the MRI results were consistent with a demyelinating disorder, a family of diseases involving damage to the protective covering (myelin sheath) that surrounds the nerves, of which MS is the most common. [R. 268–70]. Dr. Geffroy recommended that Ms. Mazonson obtain an expert opinion from an MS specialist, Dr. Rip Kinkel. Id.

On June 14, 2011, Revere (Rip) Kinkel, M.D. and Allen Nielsen, M.D., who examined Ms. Mazonson and reviewed the MRI and other studies, diagnosed her with relapsing-remitting MS. [R. 388–92].

### 3.    Opinion Evidence After the Expiration of Claimant's Insured Status

On August 8, 2012, John Jao M.D., an advising physician to the Disability Determination Service, opined that there was insufficient evidence to show that Ms. Mazonson had MS as of her date last insured (December 31, 2007). [R. 51]. Dr. Jao determined that, prior to Ms. Mazonson's MS diagnosis in 2011, there was no convincing evidence of any MS symptoms. Id. He stated that the records showed only a "remote history" of mild optic neuritis while Ms. Mazonson was in college and a family history of MS. Id.

October 18, 2012, John Manuelian, M.D., another advising physician to the Disability Determination Service, reviewed the updated record on reconsideration and also concluded that there was insufficient medical evidence to establish that MS was a severe impairment during the period at issue. [R. 62–63].

7

On August 14, 2012, Lisa Fitzpatrick, Psy.D., an advising psychologist to the Disability Determination Service, made an assessment that there was no evidence to establish a medically determinable mental impairment prior to December 31, 2007. [R. 52]. On October 23, 2012, S. Fischer, Psy.D., another advising psychologist to the Disability Determination Service, reviewed the updated record and agreed with Dr. Fitzpatrick's assessment. [R. 63].

On October 11, 2012, Elizabeth Benson, a social worker and therapist at a private medical office (Compass Medical), competed a questionnaire concerning Ms. Mazonson's mental illness and depression. [R. 451–53]. Ms. Benson reported that she first examined Ms. Mazonson on July 10, 2012, and indicated that her first signs of mental illness appeared in August or September of 2011. [R. 451]. Ms. Benson recorded Ms. Mazonson's symptoms and treatment history, suggested that her depression and MS accentuated one another, and stated that the claimant "definitely can't work." [R. 451–53].

In another questionnaire, dated August 1, 2012, Ms. Benson indicated that Ms. Mazonson's condition precluded performance of many work-related capabilities for at least 15% of an 8-hour workday. [R. 588–89]. Ms. Benson also wrote a letter in support of Ms. Mazonson's application for disability benefits, stating that she had diagnosed Ms. Mazonson with mood disorder, anxiety disorder, and posttraumatic stress disorder. [R. 591]. Ms. Benson reported that it was "clear" from Ms. Mazonson's history that she had had these conditions for much of her life. Id. She indicated that family members had exposed Ms. Mazonson to abandonment, substance abuse, and violence as a child. Id. Ms. Benson determined that there was now a "reciprocal relationship" between Ms. Mazonson's psychological conditions and MS. Id.

On June 12, 2012, Maria Houtchens, M.D., Ms. Mazonson's neurologist at the Partners MS Center, completed a questionnaire concerning Ms. Mazonson's MS. [R. 419–24; 621]. Dr.

Houtchens reported that she first saw Ms. Mazonson on January 25, 2012. [R. 419]. She reported a list of Ms. Mazonson's symptoms and treatment history, wrote that fatigue interfered with Ms. Mazonson's daily activity, and concluded that she was cognitively disabled and unable to work. [R. 419–24]. Dr. Houtchens indicated that the earliest date of Ms. Mazonson's symptoms was July 2011. [R. 421].

On October 16, 2013, Dr. Houtchens wrote a letter that described Ms. Mazonson's MS symptoms, explained that her MS "severely limit[ed] her ability to function in the workplace," and stated that she had not improved or worsened in the past year. [R. 621].

On October 2, 2013, John Sullivan, M.D. completed a questionnaire concerning Ms. Mazonson's mental abilities. [R. 618-619]. Dr. Sullivan indicated that Ms. Mazonson was precluded from performing nearly all work-related mental abilities for 10-15% of an eight-hour workday. Id. Dr. Sullivan expected that she would miss at least three days of work per month, and believed she was disabled from substantial gainful employment. [R. 620].

On October 24, 2013, Gerald Miley, M.D., a rheumatologist affiliated with New England Baptist Hospital, wrote a letter concerning Ms. Mazonson's disability application. [R. 623–24]. Dr. Miley reported that he had cared for Ms. Mazonson from September 16, 1996 through November 29, 1999, and he wrote that, in the context of her current diagnosis of MS, events in her past history took on "a new light." [R. 623]. Dr. Miley reported that, before she became his patient, Ms. Mazonson had issues of bladder "malfunction" which spontaneously resolved. Id. He also described an unexplained fall down the stairs that resulted in a severe ankle sprain, an episode of optic neuritis with partial visual loss, severe headaches that had been diagnosed as migraines, and an intermittent history of depression, psychotherapy, and treatment with psychotropic medications during the late 1990s. Id. He reported that she had suffered from

chronic fatigue during the time that he cared for her. Id. In November 1999, she experienced a frontal-occipital headache that required an emergency neurologic evaluation with a lumbar puncture. Id. Dr. Miley described MS as a "very heterogeneous disorder with an extremely variable clinical presentation" and explained that, in his professional opinion, it was "more than likely" that some of the events in Ms. Mazonson's medical history were "harbingers of [MS] in its early presentation." Id.

Ms. Mazonson appeared and testified at the administrative hearing on October 29, 2013. [R. 21-22]. She testified that she felt like she had undiagnosed MS for "quite a while," and that she had mood disorders for "a very long time." [R. 29]. Ms. Mazonson said that she did not want to believe she had MS and was in denial "for years and years," so she told her doctors she was fine. [R. 30]. She reported having difficulty with concentration, attention, and memory at work, and said that she frequently made mistakes, even on easy assignments. [R. 32]. She also testified that she experienced dizziness, fatigue, mood swings, outbursts, and crying. [R. 31, 33].

Ms. Mazonson testified that her current MS symptoms included significant intermittent pain in her torso and weakness and pain in her left leg, causing her to need a cane later in the day. [R. 33–34]. She stated that she had been experiencing fatigue and accompanying minor loss of eyesight since 2005 and an "overactive" bladder since her last year of college, although the leg issue did not begin as early as 2005. Id. Ms. Mazonson testified that her emotional outbursts were not new, and her therapist believed the outbursts were due to PTSD from her childhood. Id. Ms. Mazonson additionally reported that in 2007, she frequently became lost while driving, even when on very familiar routes. Id. She said that she had also experienced headaches. [R. 35]. She said that she did not want to discuss these issues with a therapist. Id.

Ms. Mazonson testified that she had tried to start a day care service, but even though it was only a few hours a week, "it was too much" for her and she was unable to handle it. [R. 36]. She said the librarian job she held in 2010 and 2011 was easy, low-stress, and she enjoyed it, but that she could not make it last because she was so tired. [R. 36–37]. Ms. Mazonson testified that it would have been "impossible" for her to work 40 hours a week after her first child was born. [R. 37]. She believed that fatigue and confusion kept her from being able to work. [R. 42].

## II.    THE ALJ'S DECISION

On December 26, 2013, the ALJ issued a decision finding that Ms. Mazonson was not disabled under sections 216(i) and 223(d) of the Act through December 31, 2007, the last date insured. [R. 18]. At step one of the five-step analysis, the ALJ determined that Ms. Mazonson did not engage in substantial gainful activity during the time from her alleged onset date, December 1, 2007, through her date last insured, December 31, 2007. [R. 12]. The ALJ did note that Ms. Mazonson "appears to have returned to the performance of substantial gainful activity in 2010 and 2011," when she worked as a substitute teacher and school librarian. Id. At step two of the analysis, the ALJ found that, through her date last insured, Ms. Mazonson had medically determinable impairments of headaches, eczematous dermatitis, and acute pharyngitis. [R. 13]. However, the ALJ concluded that Ms. Mazonson did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for 12 consecutive months; therefore, she did not have a severe impairment or combination of impairments. Id. The ALJ's evaluation of Ms. Mazonson's case thus ended at step two.

## III.   STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the

11

Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Commissioner of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is *de novo*. Id.; see also Nguyen v. Chater, 172 F.3d

31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec. of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte, 654 F.2d at 128).

## IV. DISCUSSION

On appeal Ms. Mazonson argues that the ALJ failed to comply with Social Security Ruling (SSR) 83-20. She contends that SSR 83-20 required the ALJ to obtain testimony from a medical expert to determine the onset date of her multiple sclerosis, which the ALJ did not do. In addition, she claims that the ALJ's decision to give less weight to a letter from Dr. Miley and statements from Ms. Mazonson's family members also violated SSR 83-20. For the reasons discussed below, the Court determines that the ALJ failed to comply with SSR 83-20, which required the ALJ to obtain testimony from a medical advisor, but because the error was harmless, the ALJ's decision is upheld.

The purpose of SSR 83-20 is to "state the policy and describe the relevant evidence to be considered when establishing the onset date of disability." SSR 83-20. In the case of disabilities of non-traumatic origin, the ruling explains that the determination of onset is to be made by considering the applicant's allegations, work history, and medical evidence. Id. Medical evidence constitutes the "primary element in the onset determination." Id. The ruling recognizes

that, in the case of disabilities that are slowly progressive, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." Id. When precise evidence is not available, "it may be possible, based on the medical evidence[,] to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination." Id. If onset must be inferred, "the administrative law judge (ALJ) should call on the services of a medical advisor" at the hearing. Id.

Ms. Mazonson contends that this language in SSR 83-20 required the ALJ to call a medical expert. The Commissioner responds that SSR 83-20 only requires a medical expert when the ALJ has already made a finding that the claimant is disabled. The Commissioner argues that because the ruling addresses the *onset* date of disability, it presupposes an initial finding that the claimant is or was disabled, and is not relevant where the claimant has never been found to be disabled. See id. ("In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability.")

The essential question — whether SSR 83-20 requires the ALJ to call a medical expert when a claimant has not been found to be disabled — has been a topic of debate within this circuit and across the country. A few months ago, the First Circuit decided a case implicating the same issue. Fischer v. Colvin, 831 F.3d 31, 38 (1st Cir. 2016). In that case, the court did not ultimately answer the question because the case was decided on other grounds. Id. at 36. The Commissioner apparently made the same argument in Fischer that she makes here, and the court discussed that argument critically. Id. at 36–38. It explained that the Commissioner's reasoning leads to the "odd" result that "when an ALJ considers disability prior to [the date last insured ("DLI")] where there is a finding of present disability, the claimant receives the protection" of SSR 83-20, but "when confronting the same question where there is no finding as to present

disability, the claimant does not have that protection." Id. at 37. The court noted that the Commissioner did not give an explanation for why the ruling should apply in one scenario but not the other when the fundamental question — the date of onset — is otherwise the same. Id. Instead of taking a side on the issue, however, the court urged the Commissioner to act quickly to revise SSR 83-20 and "enunciate a coherent explanation of the ruling's purpose and application." Id. at 39.

The Fischer case also recognized that there has been "no uniform approach in the courts" on this issue. Id. at 37. Due to this confusion, each party can point to a number of cases in support of their position.[2] As the Commissioner notes, several judges in this district have held that the SSR 83-20 guidance for determining the onset date of disability does not apply unless a finding of present disability has already been made. See Hartigan v. Colvin, No. CIV.A. 13-10540-TSH, 2014 WL 3849965, at *5 (D. Mass. Aug. 4, 2014); Silverio v. Astrue, No. CIV.A. 10-40202-FDS, 2012 WL 996857, at *6, *7 (D. Mass. Mar. 21, 2012); McDonald v. Astrue, No. CIV.A. 10-10896-DPW, 2011 WL 3562933, at *10 (D. Mass. Aug. 15, 2011). The Sixth and Seventh Circuits agree with this view. Scheck v. Barnhart, 357 F.3d 697, 701 (7th Cir. 2004); Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997). On the other hand, within this circuit, Judge Barbadoro has advocated forcefully for the view that SSR 83-20 applies regardless of whether a finding of present disability has been made. Wilson v. Colvin, 17 F. Supp. 3d 128, 139–43 (D.N.H. 2014). The Fourth and Eighth Circuits have apparently taken the same position. Bird v.

---

[2] The Commissioner correctly pointed out that most of the cases cited by Ms. Mazonson in her brief were ones in which an initial finding of disability had already been made, so the threshold question of the applicability of SSR 83-20 was not the same. See, e.g., Mason v. Apfel, 2 F. Supp. 2d 142, 146–50 (D. Mass. 1998) (Ponsor, J.); Spellman v. Shalala, 1 F.3d 357, 363 (5th Cir. 1993). Nevertheless, the Court is aware of several decisions that lend more support to Ms. Mazonson's position, as discussed in the remainder of this paragraph.

Comm'r of Soc. Sec. Admin., 699 F.3d 337, 345 (4th Cir. 2012); Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997).[3]

It would be contrary to the spirit of the Social Security Act and unreasonably rigid to hold that, as a blanket rule, the protections of SSR 83-20 do not apply where an ALJ has not had occasion to determine the claimant's present disability status. The Commissioner has made no substantive argument in support of her position (arguing only on the basis of precedent which, as discussed above, is inconclusive), and the Court does not see a compelling reason, other than the conservation of resources, to agree with the general policy proposed by the Commissioner. The language of the ruling itself could cut either way; while it does seem to assume a finding of disability, it also notes that the onset date "may even be determinative of whether the individual is entitled to or eligible for any benefits" at all.

The approach represented by SSR 83-20 is to take a nuanced, detailed, and sensitive look at the date of onset for disabilities of non-traumatic origin, especially slowly progressive diseases like MS. Under SSR 83-20, even a complete lack of medical documentation is not fatal to a claimant's case; in that situation, an ALJ must look for lay evidence from family members, friends, and former employers. It would be contradictory to decide that, because the ALJ did not find sufficient evidence to conclude that an individual was disabled prior to a certain point in time, the claimant should be denied the very procedural safeguard designed for situations in which evidence of onset can be unclear. Furthermore, as the Fischer Court pointed out, a contrary reading would lead to the puzzling result that the protection of SSR 83-20 hinges on whether the ALJ has had a reason to make a present disability finding, and there is no apparent

---

[3] In addition, some courts have questioned whether SSR 83-20's instruction that an ALJ "should" call a medical examiner is mandatory. Fischer, 831 F.3d at 38–39; Eichstadt v. Astrue, 534 F.3d 663, 667 (7th Cir. 2008).

basis for making such a distinction. 831 F.3d at 37. Indeed, in this case, the ALJ has not made a present disability determination solely because Ms. Mazonson applied only for SSDI benefits, and not SSI benefits, and the Court sees no reason why she would deserve greater protection if she had applied for the latter.

At the same time, "[w]hile an error of law by the ALJ may necessitate a remand . . . a remand is not essential if it will amount to no more than an empty exercise." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000) (citation omitted). In this case, given the nature and weight of the evidence, a remand would be pointless. Two advising physicians to the Disability Determination Service, Dr. Jao and Dr. Manuelian, have already provided a professional opinion that Ms. Mazonson's MS was not debilitating as of her date last insured. [R. 51, 62–63]. Dr. Jao further opined that there was no convincing evidence that Ms. Mazonson had *any* MS symptoms prior to her diagnosis. If the Court were to remand the case, the ALJ would be required to call a medical advisor to testify at a new hearing concerning precisely this same issue. Since the testimony would be duplicative of the opinions already offered, the Court will not require the ALJ to engage in such an empty exercise. Furthermore, the remainder of the evidence lends strong support to the ALJ's decision. None of the medical evidence indicated that Ms. Mazonson had symptoms of MS, let alone a debilitating condition, prior to her date last insured. For example, a physical just two months prior to her alleged onset date found her to be fundamentally healthy, with no major complaints, and able to exercise three times a week. [R. 224–25]. This is striking in light of the fact that Ms. Mazonson was, to some extent, suggesting that she had been suffering from MS as early as the late 1990s. The Court also finds it highly significant that the ALJ believed it likely that Ms. Mazonson had "returned to the performance of substantial gainful activity in 2010 and 2011," which was at least two years after her date last

insured. [R. 12]. During that time, her earnings apparently averaged more than $1,000 per month, the income threshold (in 2010–11) above which an individual is presumed to have engaged in substantial gainful activity. [R. 12]; 20 C.F.R. § 404.1574; POMS DI 10501.015. Given the totality and clear weight of the evidence, the procedural error here was harmless, and a remand is not necessary.

Lastly, the Court notes that the ALJ provided thorough reasoning in support of his decision to assign less weight to the letter from Dr. Miley and the testimony from Ms. Mazonson's family members. [R. 16–17]. The ALJ explained that the letter and testimony contradicted other sources of information, including medical records and earnings statements. Id. He also noted that he had consulted SSR 83-20, which limits the impact of lay evidence "to the extent that it is 'contrary to the medical evidence of record.'" Id. (quoting SSR 83-20). Thus, this aspect of the ALJ's decision was not contrary to SSR 83-20.

## IV.     CONCLUSION

For the reasons stated herein, the Court finds that the ALJ's failure to comply with the requirement of SSR 83-20 to call a medical advisor was harmless; therefore, the claimant's motion to reverse [ECF No. 15] is <u>DENIED</u>.

**SO ORDERED.**

November 15, 2016                                                                /s/ Allison D. Burroughs
                                                                                                                  ALLISON D. BURROUGHS
                                                                                                                  U.S. DISTRICT JUDGE